# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DAVID H. MANGOLD, | ) | CASE NO. 5:20-cv-214 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Plaintiff David H. Mangold ("Mangold") brought the present action challenging his termination from defendant Norfolk Southern Railway Company ("Norfolk"). Specifically, he alleges that he was disciplined and terminated in retaliation for engaging in protected activity, in violation of the anti-retaliation provisions of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109.

Norfolk now moves for summary judgment. (Doc. No. 19 ["MSJ"].) Mangold opposes the motion (Doc. No. 33 ["Opp'n"]), and Norfolk has filed a reply. (Doc. No. 37 ["Reply"]). Because Mangold has failed to demonstrate knowledge of protected activity on the part of the individuals involved in the decisions to discipline and terminate him, and because Mangold has failed to demonstrate that his protected activity was a contributing factor in the adverse decisions, Mangold's FRSA claim fails. Additionally, Norfolk has demonstrated by clear and convincing evidence that it would have made the adverse personnel decisions regardless of

Mangold's protected activity. Further, because there are no material questions of fact as to any of the claims in the complaint, Norfolk is entitled to summary judgment.[1]

## I.  BACKGROUND

Mangold began his employment in the railroad industry with Consolidated Rail Corporation ("Conrail") in 1995, and he came to work for Norfolk when it acquired Conrail in 1999. (Doc. No. 19-2 (Service Record of David Mangold ["Mangold S.R."]) at 176.[2]) At the time of his dismissal, he was a federally certified railroad engineer. (*Id.*) His employment with Norfolk was marked by a history of reporting safety complaints and disciplinary actions. Two disciplinary events are central to Mangold's FRSA claim: a March 2017 letter of reprimand for failing to properly shut down a locomotive, and the July 2017 dismissal for exceeding the maximum allowable speed on an industrial track and for inattention to duty. (*Id.*)

### A.  Disciplinary Actions

Norfolk utilizes a system of progressive discipline known as System Teamwork and Responsibility Training ("START"). (Doc. No. 19-5 (START Policy).) Under START, formal discipline may fall into one of three categories: Minor Offenses, Serious Offenses, and Major Offenses, with Major Offenses being reserved for the most serious infractions. (*Id.* at 185–86.) The progression for Serious or Major Offenses occurring with a two-year rolling period is as follows: a first offense carries a maximum suspension of thirty days deferred, a second offense carries a maximum suspension of thirty days actual, and a third offense may result in the employee's dismissal. (*Id.* at 188.) Relevant to the present suit, on December 29, 2015, Mangold

---

[1] Also before the Court is Norfolk's motion to dismiss for want of prosecution. (Doc. No. 18 ["MTD"].) Because the Court elects to reach the merits of Mangold's claims and rule directly on Norfolk's summary judgment motion, Norfolk's request for Fed. R. Civ. P. 41(a) sanctions and dismissal is moot.

signed a waiver accepting responsibility for improper train handling, which was designated as a START Serious Offense. (Mangold S.R. at 176.)[3] Also, on November 18, 2016, Mangold executed a waiver accepting responsibility for failing to follow the written instructions of a supervisor, which was designated as a START Major Offense. (*Id.*)

All START discipline received by Mangold was administered according to the terms of the collective bargaining agreement between Norfolk and Mangold's union. There is no dispute that, pursuant to the governing bargaining agreement, each disciplinary incident began with an investigation and hearing where Mangold was represented by a union official and permitted to question company witnesses, present witness testimony, and offer other evidence.

### 1. *Delay of Train Incident*

On March 5, 2017, Trainmaster Korey Peters ("Peters") was informed by a Norfolk engineer that a locomotive's batteries were "dead." (Doc. No. 19-6 (March 15, 2017 Hearing Transcript ["Hearing TR I"]) at 196.) The report led to an investigation and a hearing that was conducted on March 15, 2017, during which Peters served as the charging officer. Cleveland Terminal Assistant Superintendent Nathaniel Gaines served as the hearing officer and was the decision-maker. (*Id.* at 193.) Mangold was represented by a union official, permitted to cross-examine witnesses, and allowed to speak on his own behalf. (*Id.* at 195.) During the hearing, Peters testified that he determined that Mangold was the last engineer to run the locomotive, and that the next run was delayed by 40 minutes while a maintainer was required to come to the yard and restart the locomotive due to the fact that its batteries were drained. Mangold admitted that

---

[2] All page numbers refer to the page identification number generated by the Court's electronic docketing system.

[3] According to his service record, Mangold was suspended on June 8, 2016, dismissed from service on June 20, 2016, and then reinstated upon the execution of his waiver on November 18, 2016. (Mangold S.R. at 176.)

he left the circuit breakers up and the locomotive running after his shift because he believed that it would permit the next run to start more quickly. He maintained that he did not hear the instructions from the Yardmaster to shut down the locomotive, but he conceded that he did not know how long it would be before the next crew came out to run the locomotive. (*Id*. at 206–08, 210.)

Following the conclusion of the hearing, Gaines determined that the investigation clearly proved that Mangold failed to properly shut down his locomotive. (Doc. No. 19-8 (March 28, 2017 Letter Advising of Disciplinary Action ["Gaines Disc. Letter"]) at 214.) This was in violation of Norfolk NS-1 Rule L-219(b), which provides that "when a locomotive is to be shutdown, all circuit breakers, except those protected by a hood or shield, should be turned to the 'off' position." (Doc. No. 19-7 (NS-1 Rule L-219) at 213.) Gaines elected to issue Mangold a letter of reprimand, instead of a START Serious Offense, which would have constituted his third Serious Offense in a rolling 2-year period and subjected him to possible dismissal. (Gaines Disc. Letter.)

### 2. *Speeding/ Inattention to Duty*

The second relevant incident resulting in disciplinary action took place on June 15, 2017. On that date, Mangold was operating C27C615 locomotive, and it was alleged that his locomotive was traveling beyond the speed restriction for the track in question and that he was inattentive to his duties. (Doc. No. 19-9 (July 11, 2017 Hearing Transcript ["Hearing Tr. II"]) at 217.) J.M. Marotti ("Marotti"), Division Road Foreman of Engines, served as the charging officer, and Will Washington ("Washington"), Assistant Division Superintendent, was the

hearing officer and the decision-maker. (*Id*. at 215.) Once again, Mangold was represented by a union official, and he was permitted to question witnesses and speak on his own behalf. (*Id*.)

At the hearing, David Wheeler ("Wheeler"), the conductor assigned to work with Mangold on June 15, 2017, testified to the accuracy of the statement he gave immediately after the incident wherein he maintained Mangold pulled the train out without a signal from the Pittsburgh West Dispatcher. He represented that he yelled at Mangold to stop and, had he not intervened, Mangold would have run the stop light. (*Id*. at 229, 234.) Marotti also testified that he reviewed the data from the locomotive engine tapes and determined that the locomotive was traveling at a speed of 14 m.p.h. while within the limits of a 10 m.p.h. speed restriction. (*Id*. at 216–18, 228.) While Mangold testified that he believed he had cleared the 10 m.p.h speed zone and that he had stopped the train before moving past the red signal, he conceded that he advanced the train without permission or authority to do so and that his speed was 14 m.p.h. at the time. (*Id*. at 236–38.)

After the hearing and at the conclusion of the investigation, Washington determined that the evidence demonstrated that Mangold exceeded the maximum allowable speed on an industrial track and gave inattention to duty, in violation of Norfolk's operating rules. (Doc. No. 19-17 (July 26, 2017 Letter of Discipline ["Washington Disc. Letter"]) at 262; *see* Doc. No. 19-10 (Norfolk Operating Rules) at 245 [requiring "undivided attention to duty"]; Doc. No. 19-11 (Pittsburgh Div. Time Table No. 1 PB-135-1) at 247 [prohibiting excessive speeds], and PB-137-2 at 247 [limiting industrial tracks to 10 m.p.h.]; *see also* Doc. No. 19-11 (TT-SYS System Timetable No. 1 SP-5) at 248–49 [speed restrictions]). Mangold was dismissed from his employment with Norfolk effective immediately. (Washington Disc. Letter at 262.)

### B.    Protected Activity

Throughout his tenure with Norfolk, Mangold made numerous reports of locomotive mechanical defects. He also reported health and safety risks associated with the levels of silica sand dust emitted from the locomotive sanders, brake defects, locomotive toilet defects, and dirty locomotive air filters. (Doc. No. 33-2 (Complaint to U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA") ["OSHA Complaint"]) at 628–32.) According to Mangold, many of these reports were directed to Norfolk's mechanical department and Trainmaster Kevin Keel. (Opp'n at 601–02; *see generally* OSHA Complaint.) Much of Mangold's opposition brief is committed to recounting this protected activity and sharing his suspicion that it was the impetus for his discipline and discharge. (*See* Opp'n at 601–07.)

Norfolk does not dispute that Mangold continuously engaged in protected activity up to his discharge. It contends, however, that some of his prior protected activities were covered by a settlement entered into by Norfolk and Mangold on January 27, 2017 and January 31, 2017, concerning an earlier FRSA claim brought by Mangold. (Doc. No. 19-19 (Confidential Settlement Agreement and Release ["Settlement Agreement"]).) By the express terms of the Settlement Agreement, Mangold represented that his only claim against Norfolk was his then pending FRSA complaint, and he agreed to waive his right to pursue his previously filed complaint. (Settlement Agreement at 297, ¶ 6.) On February 1, 2017, OSHA approved the Settlement Agreement and issued a notification advising the parties that the matter had been resolved and that the settlement "constitutes the final order of the Secretary and may be enforced in accordance with OSHA's regulations." (Doc. No. 19-20 ["OSHA Letter"]) at 302.)

6

### C.      OSHA Complaint

On August 4, 2017, Mangold filed a complaint with OSHA, alleging retaliation in violation of FRSA. (OSHA Complaint.) On March 15, 2019, after completing its investigation, OSHA concluded that Norfolk had not violated FRSA when it terminated Mangold, and it dismissed his complaint. (Doc. No. 33-9 (OSHA Dismissal Letter).) Mangold filed his objections on April 11, 2019 with the Office of Administrative Law Judges and, on May 10, 2019, the matter was assigned to an Administrative Law Judge ("ALJ") for subsequent proceedings and a hearing, if necessary. (*See* Doc. No. 33-10.)

On January 13, 2020, Mangold filed his Intent to Litigate in federal district court, exercising the FRSA's Kick-Out provision in 49 U.S.C. § 20109(d)(3). (Doc. No. 33-11 (Jan. 13, 2020 Letter of Intent ["Letter Intent"]).)[4] The ALJ initially stayed the case but later dismissed the administrative matter after Mangold brought suit in federal court.

### D.      Federal Litigation

On January 31, 2020, Mangold filed the present action against Norfolk primarily alleging violations of FRSA. (Doc. No. 1 (Complaint ["Compl."]).) Specifically, Mangold asserts that Norfolk retaliated against him for his protected activities involving his reporting of alleged safety and health violations. In addition to a FRSA claim (Count One), Mangold's complaint appears to raise a state law breach of contract claim (Count Two). The breach of contract claim is premised on allegations that Norfolk "has not fully complied" with portions of the Settlement Agreement specifically giving Mangold the "right to address concerns regarding mechanical issues,

---

[4] The FRSA "kick-out" provides that, if the Secretary of Labor fails to issue a final decision within 210 days, the complainant may remove the dispute to federal court by filing an original *de novo* action. 49 U.S.C. § 20109(d)(3).

locomotive defects and concerns about silica sand dust" with Norfolk officers.[5] (Compl. ¶ 33.)
He seeks reinstatement, expungement of all discipline, as well as compensatory and punitive
damages, costs, and fees. (*Id*. at 8–9.)

The procedural history of this case has been marked by delays and a lack of diligence on
the part of plaintiff and his counsel. On June 8, 2020, the Court conducted a telephonic status
conference with counsel to discuss Norfolk's representation in a status report that Mangold and
his counsel had failed to participate in the preparation of the required report or otherwise engage
in *any* discovery. (*See* Doc. No. 15 (First Status Report).) Notwithstanding the Court's reminder
to plaintiff's counsel of the obligation to prosecute the case, cooperate with discovery, and to
assist in the preparation of 45-day joint status reports, future reports reflected that Mangold and
his counsel did not conduct discovery during the period set by the Court in its Case Management
Plan and Trial Order ("CMPTO"). (Doc. No. 22 (Memorandum Opinion and Order ["MOO"]);
*see* Doc. No. 14 ["CMPTO"] at 76, identifying July 31, 2020 as the deadline for non-expert
discovery.)

On August 3, 2020, Norfolk filed the present motion for summary judgment, as well as a
motion to dismiss for want of prosecution under Fed. R. Civ. P. 41(b). (*See* MTD.) The Rule
41(b) motion was premised on Mangold's alleged failure to participate in the prosecution of the
case both in federal court and before the ALJ. It sought dismissal of this action with prejudice.

---

[5] It is unclear whether Mangold intended to bring a stand-alone contract claim, or whether the allegations relating to
the Settlement Agreement were meant solely to augment the federal FRSA claim. The complaint purports to set out
a separate count for "breach of contract" (Count Two), but an allegation therein asserts that Norfolk's alleged breach
of the Settlement Agreement constitutes a violation of the "Whistleblower Act." (Compl. ¶ 34.) Norfolk argues that
Mangold is foreclosed from relying on any protected activity covered by the Settlement Agreement in this action. In
an abundance of caution, the Court has considered all of Mangold's protected activity, including those actions
covered by the Settlement Agreement.

(*See id*.) The following day (August 4, 2020)—five days after the expiration of the discovery period set in the CMPTO—Mangold filed a motion requesting an extension of an unspecified period of time in which to conduct discovery. (Doc. No. 20.) In his motion, he cited, for the first time, health concerns of co-counsel and the "very pressing caseload" of lead counsel. (*Id*. at 363.)

The Court denied the motion to extend discovery for want of good cause shown, citing the many delays and the failure of Mangold and his counsel to timely apprise the Court of its perceived difficulties in completing discovery within the time frame set in the CMPTO. (MOO at 372–73.) Following the Court's ruling, the parties completed briefing on Norfolk's pending motions. While Norfolk has made a compelling case for dismissal as a sanction for failure to prosecute (*see* MTD; MOO), given the fact that the parties were able to brief the question of whether the case should survive summary judgment under Fed. R. Civ. P. 56, the Court elects to address the case on the merits.[6]

In its motion for summary judgment, Norfolk argues that the record supports the finding that Mangold was disciplined for clear safety rule violations. It complains that Mangold can cite to nothing in the record that can create a genuine issue of material fact that, if believed, would demonstrate that his protected activities prompted Norfolk to discipline him. Norfolk further

---

[6] The manner in which Mangold's brief in opposition to summary judgment was presented highlights Mangold's inattention to the prosecution of this case. While Mangold timely submitted his initial opposition brief (*see* Doc. No. 30), it was largely devoid of any record citations and included no exhibits. The following day (October 10, 2020), the day after the filing deadline, Mangold submitted (without leave) another opposition brief, accompanied by several exhibits. (*See* Doc. No. 31.) Three days later—and four days after the filing deadline—Mangold submitted his *third* opposition brief with additional designated exhibits. (*See* Doc. No. 33.) The same day, Mangold filed a motion to correct his prior filings and a motion to file an oversized brief. (Doc. No. 34.) Needless to say, the Court's deadlines are not an invitation to file an opening brief with unlimited leave to amend at will. Nevertheless, because Norfolk was able to address the arguments raised in and exhibits attached to the third submitted opposition brief (Doc. No. 33), the Court GRANTS the motion to correct and file an oversized brief. It treats this subsequent filing (Doc. No. 33) as Mangold's official response to Norfolk's summary judgment motion.

insists that it is able to establish, as a matter of law, that Norfolk would have disciplined Mangold regardless of his protected action.

## II. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### III. DISCUSSION

**A.      FRSA Claim**

The FRSA prohibits a railroad carrier from retaliating against an employee who has, in good faith, engaged in a protected activity. 49 U.S.C. § 20109(a). Claims under the FRSA are analyzed under the same burden-shifting framework as those asserted under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century. 49 U.S.C. § 20109(d)(2)(i). That is, the employee must first make a *prima facie* showing that "(1) he engaged in protected activity; (2) the employer knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action." *Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 337 (6th Cir. 2014) (citing *Araujo v. New Jersey Transit Rail Operations, Inc*., 708 F.3d 152, 157 (3d Cir. 2013)); *see also* 29 U.S.C. § 1982.109(a). Once the employee satisfies the initial burden, the employer must demonstrate "by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected behavior." 29 U.S.C. § 1982.109(a); *see also Consol. Rail Corp*., 567 F. App'x at 337.

Norfolk does not deny that Mangold engaged in protective activity, and that—at least with respect to his discharge—he suffered an unfavorable personnel action. It questions whether Mangold's March 28, 2017 letter of reprimand constitutes an adverse employment action, and it points to case law outside the context of FRSA retaliation claims that generally treats letters of reprimand, which do not result in loss of employment, status, or salary, as falling short of constituting unfavorable personnel actions. (MSJ at 168–69, citing, among authority, *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013) (in Title VII action, letter of reprimand was not an

adverse action); *Jones v. Butler Metro. Hous. Auth.*, 40 F. App'x 131, 137 (6th Cir. 2002) (same).) But courts have observed that the FRSA sets a very low bar for "adverse" action that would appear to include a reprimand or disciplining. *See Heim v. BNSF R. Co.*, No. 8:13-cv-369, 2015 WL 5775599, at *3 (D. Neb. Sept. 30, 2015) (citing 29 U.S.C. § 20109(a)(4); 29 C.F.R. § 1982.102(b)(2)(iv)); *see also Ryan v. CSX Transp., Inc.*, No. 1:17-cv-353, 2019 WL 3254129, at *4 (S.D. Ohio July 19, 2019) (noting that "FRSA burden-shifting is much more protective of plaintiff-employees than the *McDonnell Douglas* framework[,]" and finding the contributing factor test for FRSA claims more lenient than for retaliation under Title VII). Accordingly, solely for the purposes of the present summary judgment motion, the Court will assume that the reprimand constitutes an adverse employment action.

This leaves the second and forth prongs of the *prima facie* case—whether the employer knew about Mangold's protected activity and whether it was a contributing factor in the disciplinary decisions. The Court takes each prong in turn.

### 1. Employer's Knowledge

As part of his initial burden, Mangold must show that Norfolk "knew" that he engaged in protected activity. *Conrail*, 567 F. App'x at 337. "The 'knowledge' relevant for a retaliation claim under the FRSA must be tied to the decision-maker *involved* in the unfavorable personnel action." *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 108 (4th Cir. 2016) (emphasis added); *Loos v. BNSF Ry. Co.*, 865 F.3d 1106, 1115 (8th Cir. 2017) (same), *rev'd on other grounds by BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 203 L. Ed. 2d 160 (2019). "And yet, a 'plaintiff is not required to have direct evidence of knowledge[.]'" *Gibbs v. Norfolk S. Ry. Co.*, No. 3:14-cv-587, 2018 WL 1542141, at *6 (W.D. Ky. Mar. 29, 2018) (quoting *Conrail*, 567 F. App'x at 338)). Additionally,

Mangold "need not prove that the decision-maker responsible for the adverse action knew of the protected activity if it can be established that those *advising* the decision-maker knew, regardless of their motives." *Id.* (quoting *Rudolph v. Nat'l R.R. Passenger Corp.*, ARB Case No. 11-037, 2013 WL 1385560, at *12 (Dep't of Labor Mar. 29, 2013) (emphasis supplied by district court)).

Beginning with the March 28, 2017 letter of reprimand, it is undisputed that Peters was the charging officer and Gaines was the hearing officer. Mangold testified that he could not recall a specific instance when he reported a safety concern to Peters, and that he never made a report to Gaines. (Doc. No. 19-18 (Deposition of David Mangold before OSHA ["Mangold Dep."]) at 275, 277, 279.) He acknowledged that he got along well with Peters and that the only safety report that Peters *may have been aware of* was a report to a yardmaster that Peters would have potentially learned of *after investigating* the battery incident. (*Id.* at 278.) Crucially, Mangold conceded that he did not have any personal knowledge as to how Gaines arrived at his decision, that Gaines was lenient in offering a letter of reprimand, and that he believed Gaines came to his conclusion based on the facts and evidence presented at the hearing. (*Id.* at 290–91.)

As for the July 26, 2017 dismissal, it is undisputed that Marotti was the charging officer, and Washington was the hearing officer and decision-maker. Mangold testified that he did not have any evidence that Washington was ever aware of his protected activity, or that Washington considered anything besides the evidence in the record at the hearing in making his decision. (Mangold Dep. at 294.) He also testified that he had no information that Marotti had any other motivation besides enforcing company rules in charging Mangold. (*Id.* at 272–73.)

Still, Mangold argues in his brief that Marotti may have been aware of the protected activity covered by the 2016 Settlement Agreement, but his record citations do not support these

representations.[7] And while he offers various exhibits demonstrating that other officials at Norfolk may have been aware of past protected activity, he points to nothing in the record that would suggest that the decision-makers, or even the charging officers under a cat's-paw theory of knowledge, were aware of his protected activity.[8] (*See* Opp'n at 601–07.) Instead, he argues simply that "[t]here is no question that Defendant knew that Plaintiff Mangold engaged in protected activity and that it took an adverse action against Plaintiff by terminating his employment." (*Id*. at 611.)

It is not enough to demonstrate that Norfolk as a company, or that certain individuals within the Norfolk organization, knew about his protected activity. To defeat summary judgment, Mangold was required to point to record evidence that would create a genuine issue of material fact as to whether the decision-makers had knowledge. *See Kuduk*, 768 F.3d at 791 (a lower-level supervisor's knowledge was not sufficient where the "decision-makers had no knowledge—actual or constructive—of [the employee's] protected activity"). Mangold has failed to so, and, for this reason alone, Norfolk is entitled to summary judgment on his FRSA

---

[7] For example, Mangold maintains that he sent a correspondence to Marotti on May 15, 2017 regarding his concerns over the matters addressed in the 2016 Settlement Agreement. (Opp'n at 605.) However, he does not produce the correspondence. Instead, he cites to an April 16, 2016 email from Trainmaster Stephen Grankowski and addressed to Mangold, wherein Grankowski identifies certain rules and/or regulations Grankowski believes Mangold does not understand. Marotti is not copied on the email or mentioned therein. (*See* Opp'n at 605, citing Doc. No. 33-3 ["Grankowski Email"].) He also suggests that Marotti advised him during and/or after a meeting on May 16, 2017 that he would take no action on Mangold's alleged rules compliance issues, but Mangold offers no record citation to support this conclusory representation either. (*See* Opp'n at 607; *see also id*. at 622 [indicating, without support, that Marotti was present during a meeting where the locomotive defects relating to silica sand dust raised by Mangold were discussed].)

[8] Under the cat's paw theory, a decision-maker may have constructive knowledge of an employee's protected activity if a supervisor who is aware of the protected activity takes an action that is intended by the supervisor to cause or bring about the adverse employment action. *See Kuduk*, 768 F.3d at 790 (citing *Staub v. Proctor Hosp*., 562 U.S. 411, 131 S. Ct. 1186, 1190 n.1, 179 L. Ed. 2d 144 (2011); 29 C.F.R. § 1982.104(e)(2)(ii)). Mangold does not suggest that he is offering a cat's paw theory of constructive knowledge, nor does he identify disputed material facts that, if believed, would support such a theory.

claim. *See, e.g., Conrad*, 824 F.3d at 108 (railroad was entitled to judgment on FRSA claim because employee had no evidence of animus or knowledge by relevant decision-makers); *see also Gibbs*, 2018 WL 1542141, at *6 (in the face of undisputed evidence that the decision-makers were unaware of employee's protected activity, employee's speculation that everyone in management must have known insufficient to stave off summary judgment).

### 2. *Contributing Factor*

In his opposition brief, Mangold focuses on the fourth prong of the *prima facie* case—that his protected activity contributed to the adverse employment decisions. "[T]he contributing factor standard has been understood to mean 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" *Consol. Rail Corp.*, 567 F. App'x at 338 (quoting *Araujo*, 708 F.3d at 158). In other words, an employee "need only show that his protected activity was a 'contributing factor' … not the sole or even predominate cause." *Araujo*, 708 F.3d at 158. And he can do this through either direct or circumstantial evidence. *Gibbs*, 2018 WL 1542141, at *8 (citing *Wagner v. Grand Truck W. R.R.*, No. 15-10635, 2017 WL 733279, at *4 (E.D. Mich. Feb. 24, 2017)). Courts within the Sixth Circuit have relied on a variety of factors to demonstrate circumstantial evidence, including: temporal proximity, indications of pretext, inconsistent application of an employee's policies, shifting explanations for an employer's actions, antagonism or hostility toward a complainant's protected activity, falsity of an employer's explanation for the adverse action taken, and change in the employer's attitude toward the complainant after he engages in protected activity. *See, e.g., Bostek v. Norfolk Ry. Co.*, No. 3:16-cv-2416, 2019 WL 2774147, at *5 (N.D. Ohio July 2, 2019) (citing *Gibbs*, 2018 WL 1542141, at *8); *see also Loos*, 2015 WL 3970169, at *5 (relying on similar factors).

There is no evidence of shifting explanations for disciplinary action taken, and no change in attitudes toward Mangold after he engaged in protected activity. He argues that he was subjected to hostility and harassment as a result of his protected activity. Specifically, he cites an April 16, 2016 email from Trainmaster Grankowski to Mangold outlining several rules he believed Mangold may not have properly understood. (Opp'n at 605, 611–12, citing Grankowski email at 633–34.) He also cites a May 4, 2016 letter from Road Foreman of Engines for the Cleveland Terminal, Andrew Jones, instructing him to stop reporting non-defects in the locomotives because the practice misallocates limited service resources. (*Id.* at 606, 611–12, citing Doc. No. 33-3 ["Jones Letter"].) While Mangold characterizes these communications as clear evidence of hostility (*see id.* at 611, 622), the Court finds these isolated comments from non-decision-makers are not circumstantial evidence of an improper motive, and Mangold has failed to come forward with any evidence demonstrating that they were offered for any reason other than to correct his alleged reporting deficiencies. *See, e.g., Ryan*, 2019 WL 3254129, at *5 (isolated comments to employee were not evidence of improper motive); *Loos*, 2015 WL 3970169, at *6 (stray remarks from supervisors inferring that employee had used the wrong code in reporting violations was not evidence of antagonism or hostility toward protected activity).

Mangold also offers a list of comparators that he says demonstrates that employees with "similar work histories" and records as his were not terminated for speeding. (Opp'n at 623, citing Doc. No. 33-26.) However, his list was originally produced as an exhibit to Norfolk's motion (*see* Doc. No. 19-21) offered to show that Norfolk regularly classified speeding as a START Serious or Major Offense. This exhibit does not include any employees who, like Mangold, had accumulated three or more START Serious or Major Offenses in a rolling two-

year period. Mangold had the duty to prove that his comparators were "'similarly situated in all relevant respects,'" which he has failed to do. *See Gibbs*, 2018 WL 1542141, at *9 (quoting *Dafoe v. BNSF Ry. Co*., 164 F. Supp. 3d 1101, 1110 (D. Minn. 2016)); *see, e.g., Gunderson v. BNSF Ry. Corp*., 850 F.3d 962, 970 (8th Cir. 2017) (comparators were not similarly situated where plaintiff's behavior was far more egregious). If anything, this evidence demonstrates that Norfolk consistently treated speeding incidents as serious.

Mangold also argues that he "had reported locomotives defects throughout his employment history … [and] [h]e was reporting defects even up through his last day of service." (Opp'n at 622.) But Mangold's reliance on temporal proximity is undermined by the fact that his protected activity—mostly related to silica sand dust in the locomotives—was entirely unrelated to the intervening acts associated with the discipline. *See, e.g., Kuduk*, 768 F.3d at 791–92 ("it is particularly significant at the summary judgment stage that Kuduk's protected activity, though close in time, was completely unrelated to the fouling-the-tracks incident that led to his discharge. … Kuduk's fouling of the tracks on June 9 was an intervening event that *independently* justified adverse disciplinary action") (emphasis in original); *Bostek*, 2019 WL 2774147, at *5 (temporal proximity diminished by employee's intervening misconduct that led to her discharge). Here, Mangold's decisions to leave the circuit breakers up on the locomotive that led to the letter of reprimand and his alleged speeding and inattention to duty on June 15, 2017 were intervening events that independently justified the adverse employment decisions. *See Gonzalez v. Metro-North Commuter R.R.*, No. 18-cv-10270, 2020 WL 230115, at *8 (S.D.N.Y. Jan. 15, 2020) ("An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might

otherwise suffice to raise the inference.") (quotation marks and citation omitted); *Gibbs*, 2018 WL 1542141, at *8 ("Gibbs's decision to take a company truck, park it in a secluded area behind a restaurant, and wait for a call, is an intervening event that independently justified adverse action.") "The Court thus finds that [Mangold] may not solely rely on temporal proximity to demonstrate that his protected activity was a contributing factor in Norfolk's decision to" discipline and discharge him. *Id*.

Mangold has presented no evidence showing that his alleged protected activities were contributing factors in his discipline and discharge. His reliance on conjecture and speculation that he was targeted for protected activity that he consistently engaged in throughout his entire railroad career is insufficient, in the face of a fully supported dispositive motion, to satisfy his initial burden of demonstrating the existence of a *prima face* case of retaliation. *See, e.g., Conrad*, 824 F.3d at 109 ("At bottom, Conrad urges us to rely on a series of inference upon inference, based on the chain of command, to conjure a scheme among higher-level CSX supervisors who were aware of his protected activity and sought to silence his FRSA complaints because he was 'a thorn in [their] side.'")

### 3. Pretext

Even if Mangold had established a *prima facie* case of retaliation (which he has not), Norfolk has demonstrated by clear and convincing evidence that it would have disciplined and/or discharged him based on his various rules violations. Much of Mangold's opposition brief is devoted to challenging the accuracy of the application of the rules to his behavior, highlighting inconsistencies in data relied upon at the hearing with later acquired data, and contesting the decision-makers' evaluation of the evidence presented at the hearings. But this Court declines to

review the merits of the discipline because,

> "federal courts do not sit as a super-personnel department that re-examines an employer's disciplinary decisions." *Kuduk*, 768 F.3d at 792 (quotation omitted). The critical inquiry in a pretext analysis "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge. *McCullough v. Univ. of Ark. For Med. Scis*., 559 F.3d 855, 861–62 (8th Cir. 2009). Moreover, if the discipline was wholly unrelated to the protected activity, whether it was fairly imposed is not relevant to FRSA causal analysis. "An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008).

*Gunderson*, 850 F.3d at 969–70. *See Seeger v. Cincinnati Bell Tel. Co*., LLC, 681 F.3d 274, 285 (6th Cir. 2012) (endorsing the "honest belief rule" and noting that, to establish pretext, a plaintiff "is required to show 'more than a dispute over the facts upon which the discharge was based'") (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). Here, there is nothing in the record that would show that the relevant decision-makers did not believe in good faith that Mangold was guilty of the conduct justifying the letter of reprimand and the subsequent dismissal. In light of the undisputed record evidence that Mangold's discipline—which was unrelated to his protected activity, administered in accordance with START procedures and the governing collective bargaining agreement after a hearing where he was represented and given a full opportunity to present his case, and imposed by decision-makers unaware of his protected activity—was issued in good faith, Mangold's unsupported speculations as to retaliation fail to show pretext. *See, e.g., Heim*, 2015 WL 5775599, at *5 ("In the absence of evidence suggesting that retaliation for reporting an injury was a contributing factor to his discipline, Heim is not entitled to relief, even if BNSF's disciplinary decision was inaccurate."). Accordingly, Norfolk is entitled to summary judgment on Mangold's FRSA claim for this additional reason.

20

**B.      Breach of Contract Claim**

In Count Two of the Complaint, Mangold alleges that Norfolk "has not fully complied with a portion of the January 27, 2017 Settlement Agreement which [] Mangold specifically had a right to address concerning mechanical issues, locomotive defects and concerns about silica sand dust with [Norfolk] officers[.]" (Compl. ¶ 33.) The claim appears to center on paragraph 2 of the Settlement Agreement, which provides: ["Norfolk] will make available an official from its Safety, Transportation and Mechanical department to discuss Mr. Mangold's concerns regarding silica and sand dust, locomotive inspections and mechanical issues." (Settlement Agreement ¶ 2, at 297.)

Norfolk seeks summary judgment on this state law claim. It argues that the undisputed facts demonstrate that it complied with the plain language of the agreement. Specifically, it cites Mangold's deposition testimony wherein he conceded that Norfolk did, indeed, make officials available, upon his initial request, to discuss his various concerns. (Mangold Dep. at 283 [Q: "And in fact, [Norfolk] did make those people available upon your first request; correct?"; A: "Upon my request and phone conversations, those meetings did occur."].) Given that the agreement did not contain a time limit or a requirement that Norfolk set up the meeting, it argues that it is entitled to summary judgment on this claim. (MSJ at 173.)

Mangold failed to address this argument in his opposition brief and, for this reason alone, the claim is subject to dismissal. *See, e.g., Hutchins v. Abbott Labs., Inc*., No. 1:14-cv-176, 2016 WL 5661582, at *4 (N.D. Ohio Sept. 30, 2016) (determining that the failure to oppose certain arguments or evidence as to a particular claim waived the non-movant's defense and entitled movant to summary judgment). Moreover, the undisputed evidence demonstrates that Norfolk

did comply with the plain language of the Settlement Agreement. *See, e.g., R.E. Dailey & Co. v. John Madden Co*., No. 93-1058, 1 F.3d 1242 (Table), 1993 WL 288269, at *5 (6th Cir. July 28, 1993) (granting defendant's motion for summary judgment where the undisputed facts demonstrated that the defendant had complied with the plain language of the agreement, while simultaneously rejecting plaintiff's overtures to read additional terms where the contract was silent or clear). To the extent Count Two represents a stand-alone state law breach of contract claim, it is dismissed.

## IV. CONCLUSION

For the foregoing reasons, Norfolk's summary judgment motion is GRANTED, and this case is DISMISSED.

**IT IS SO ORDERED**.


Dated: December 14, 2020

                **HONORABLE SARA LIOI**
                **UNITED STATES DISTRICT JUDGE**